[Nos. 13813-1-II; 13864-6-II.    Division Two.    December 27, 1993.]

THE STATE OF WASHINGTON, *Respondent,* v. JOHN P. KENNEDY, ET AL, *Appellants.*

*Robert M. Quillian, Thomas E. Doyle,* and *Leslie O. Stomsvik,* for appellants (appointed counsel for appeal).

*Gary P. Burleson, Prosecuting Attorney,* for respondent.

GREEN, J.* — John Kennedy and Frank Gookin were each charged and convicted of unlawful manufacture and/or possession with intent to deliver methamphetamines, and possession with intent to deliver methamphetamines. In this consolidated appeal, they contend the trial court erred by (1) denying their motions to suppress evidence seized during execution of a search warrant they contend was issued without probable cause; and (2) refusing to require the State to disclose the identity of a confidential informant. We find no error and affirm.

The search warrant in question was issued by the Mason County District Court based on the affidavit of Detectives Pfitzer and Kelley of the Shelton Police Department. This affidavit contained the following facts:

1. On August 21, 1989, the detectives received information from a confidential informant (CI #326) that George P. Cormier "was a large drug dealer who lived in Gig Harbor, but is working around the Mason County area." The informant stated that Cormier "cooks drugs", is "dangerous" and the informant was "afraid" of him.

---

*Judge Dale M. Green is serving as a judge pro tempore of the Court of Appeals pursuant to CAR 21(c).

2. On October 7, Tracy Wolle, manager of the Alderbrook Inn in Union, telephoned Detective Pfitzer and advised him that an individual named George Cormier had checked into the Inn on October 5 "giving false information along with other suspicious circumstances that led employees . . . to believe there was a drug lab in a rented room." On the registration slip, Cormier gave a

Gig Harbor address and identified his vehicle as a Pinto with license number KZ 189. While registering, Cormier showed the desk receptionist an envelope stuffed full of money and bragged about it containing five thousand dollars. The room was rented for four nights at $105.00 per night, paying with hundred dollar bills from the envelope of money.

3. On October 6, two "room service maids, Linda K. Clemenson and Melinda L. Schoene, went to the cottage rented by Cormier to service the room. They noticed all the curtains and shades drawn closed on the windows" and "smelled a strong chemical smell at the cottage[1] . . . When the maids knocked on the door a subject cracked the door just enough to talk to them. The subject told them that he wanted no service and needed nothing."

4. The next day, October 7,

the maids, Schoene and Clemenson, called the cottage occupied by Cormier to inquire about servicing the room. They called repeatedly but received no answer, so they went to the cottage to service it. When they arrived at the cottage they noticed someone look out the windows as they pulled in. Again all the shades were drawn closed. They knocked and a different person, a white female cracked the door open just far enough to talk. The female subject told them they wanted no room service. Schoene again smelled the chemical smell while standing in front of the door which was just cracked open. Schoene said that when she knocked on the door, she heard rustling from inside and heard what she said sounded like utensils falling and hitting the floor. Schoene and Clemenson said both persons they contacted at the cottage appeared stoned on drugs to them, and acted very strange.

5. Later, the same day, October 7, Detective Pfitzer "went to the cottage disguised as an employee and knocked on the

---

[1] At the suppression hearing, the chemical odor was described as "ether". Report of Proceedings, at 63.

door. A white male unlike the male described by the maids opened the door by cracking it slightly. Again the shades were drawn closed." Pfitzer told the subject

I had a repair order and he told me they wanted no service in the room. While at the cottage I observed three vehicles parked out front including a brown Ford Granada Washington license KYV 189, which is the vehicle mentioned in several contacts with CI #326 as being involved in [Cormier's] drug dealings. This was also the vehicle Cormier was in when registering, note it is not a Pinto but a Granada, and the actual license is KYV 189, not KZ 189 as Cormier used when registering.

6. On October 8, "Cormier brought a bunch of linen to the Inn's office and asked for clean linen in exchange. Employees smelled the soiled linen and called Detectives to say that the linen smelled of the chemical odor."

7. On October 9, "the subject believed to be Cormier rented the room for one more night. In doing so he again showed a large amount of cash from an envelope."

8. Later, on October 9

at about 1110 hrs., CI #326 called Detectives to give information about Cormier. This was the fifth or sixth call to Detectives about Cormier since August of 1989. CI #326 called to advise that Cormier had recently moved from his residence in Gig Harbor, that he was still active in cooking drugs.

9. The affidavit then states that based on the detectives' training and experience certain listed items are characteristic of traffickers in controlled substances. One of those items was the necessity to "maintain on hand large amounts of U.S. currency in order to maintain and finance their ongoing narcotics business."

Based on the contents of this affidavit, the Mason County District Court judge on October 9 found probable cause and issued a search warrant for the cottage.

When the warrant was executed, methamphetamines and a number of items typical of a methamphetamine lab were found. Those present in the cottage, Kennedy, Gookin and Jody Sweet, were arrested. Later Joan Hilgar arrived at the cottage in the Ford Granada and was arrested. A few minutes later, Cormier arrived and was arrested.

They were all charged with manufacturing and/or possessing methamphetamines with intent to deliver. Before trial, Cormier and Sweet pleaded guilty; Kennedy and Gookin proceeded to trial. They moved to suppress the evidence obtained during the search on the ground the search warrant had been issued without probable cause and was therefore invalid. This motion was denied.

At trial, both Cormier and Sweet testified that all of them were involved in the manufacture and sale of methamphetamines and had set up a lab in the cottage. The existence of a drug laboratory was confirmed by the testimony of a chemist. Kennedy and Gookin were convicted and this appeal followed.

Kennedy and Gookin first claim the trial court·erred in finding issuance of the search warrants was supported by probable cause and denying their motions to suppress evidence obtained in the search.

The validity of a search warrant is reviewed for abuse of discretion, *State v. Cord*, 103 Wn.2d 361, 366, 693 P.2d 81 (1985), giving great deference to the magistrate's determination of probable cause, *State v. Coates*, 107 Wn.2d 882, 888, 735 P.2d 64 (1987), and resolving all doubts in favor of the warrant's validity, *State v. Wilke*, 55 Wn. App. 470, 476, 778 P.2d 1054, *review denied*, 113 Wn.2d 1032 (1989). When reviewing the affidavit in support of the application for a search warrant, the magistrate is entitled to draw common sense inferences from the stated facts. *State v. Cherry*, 61 Wn. App. 301, 304, 810 P.2d 940, *review denied*, 117 Wn.2d 1018 (1991); *State v. Helmka*, 86 Wn.2d 91, 542 P.2d 115 (1975). It is only the probability of criminal activity and not a prima facie showing of it which governs the standard of probable cause. *State v. Seagull*, 95 Wn.2d 898, 907, 632 P.2d 44 (1981).

Kennedy and Gookin contend that as to the confidential informant the affidavit supporting the issuance of the search warrant fails to satisfy the basis of knowledge and reliability

prongs of *Aguilar-Spinelli*.[2] Thus, the court erred when it denied their motion to suppress the evidence found during the search. The State concedes this to be true, but takes the position that independent investigation corroborated the tip to such an extent that the missing elements of the *Aguilar-Spinelli* test were satisfied, citing *State v. Jackson*, 102 Wn.2d 432, 438, 688 P.2d 136 (1984). We agree.

■ In *Jackson*, the court stated, at page 438:

> if the informant's tip fails under either or both of the two prongs of *Aguilar-Spinelli*, probable cause may yet be established by independent police investigatory work that corroborates the tip to such an extent that it supports the missing elements of the *Aguilar-Spinelli* test. The independent police investigations should point to suspicious activity, ["]*probative indications of criminal activity* along the lines suggested by the informant". . . . Merely verifying "innocuous details", commonly known facts or easily predictable events should not suffice to remedy a deficiency in either the basis of knowledge or veracity prong. . . .

(Citations omitted.)

Here, Cormier registered at the Alderbrook Inn, a resort complex on Hood Canal in Mason County. His registration showed a Gig Harbor address. At the time of registration, he displayed an envelope stuffed full of money and bragged it contained $5,000. He paid four nights' lodging at $105 per night in $100 bills from the envelope. Experienced officers stated a characteristic of drug dealers is to carry large amounts of cash. Although Cormier registered otherwise, he drove a Ford Granada, license KYV 189, as reported by the informant. At all times, the shades on the cottage window were drawn closed and the maids were refused entrance to clean and make up the cottage. On consecutive days when the maids knocked on the cottage door, a male on the first day and a female on the second day opened the door only a crack to refuse service. One day the maids heard rustling and what appeared to be utensils falling on the floor. On each occasion the maids smelled a strong

---

[2]*Aguilar v. Texas*, 378 U.S. 108, 12 L. Ed. 2d 723, 84 S. Ct. 1509 (1964); *Spinelli v. United States*, 393 U.S. 410, 21 L. Ed. 2d 637, 89 S. Ct. 584 (1969).

chemical odor and the person who answered the door "appeared to be stoned on drugs." On the third day, Cormier delivered linen to the office in exchange for clean linen. The soiled linen smelled of the same chemical odor. Throughout Cormier's occupancy of the cottage, his Granada and other cars were parked at the cottage.

Kennedy and Gookin argue these are innocuous facts and are as consistent with legal activity as they are with criminal activity. As the court in *Jackson* noted, "independent police investigations should point to suspicious activity, ' "probative indications of criminal activity along the lines suggested by the informant'." (Italics omitted.) *Jackson,* at 438 (quoting *United States v. Canieso*, 470 F.2d 1224, 1231 (2d Cir. 1972)). Under different circumstances, mere registration while driving a Granada, license KYV 189, and the refusal of maid service at the cottage, without more, would be innocuous facts insufficient to corroborate the informant's tip. However, here such facts are coupled with other suspicious activities: the presence of several cars outside the cottage; different people answering the maid's knock at the door to refuse service; the presence of a strong chemical odor emanating from the cottage and from the linen delivered to the office; and the maid's observation that those who answered the door appeared "stoned" on drugs. These activities were shrouded in secrecy by the constantly drawn shades. Not only are these suspicious activities, particularly at a resort where there are outdoor recreational activities, they are probative indications of criminal activity along the lines suggested by the informant.

Drawing commonsense inferences from the stated facts, giving deference to the magistrate's determination of probable cause, and resolving all doubts in favor of the warrant's validity, we conclude the affidavit established probable cause to issue the search warrant and the trial judge who reached the same conclusion in denying the motion to suppress should be affirmed.

Secondly, Kennedy claims the court erred when it refused to require disclosure of the identity of the confidential informant. We find no error.

██ ██ The State has a qualified privilege to not disclose the identity of a confidential informant. *State v. Walton*, 64 Wn. App. 410, 415, 824 P.2d 533, *review denied*, 119 Wn.2d 1011 (1992); *see* CrR 4.7(f)(2).[3] To determine whether disclosure is warranted, CrR 4.7(f)(2) requires balancing the public interest in preventing criminal activity and protecting the flow of information to the police against the defendant's right to prepare a defense. *State v. Stansbury*, 64 Wn. App. 601, 604, 825 P.2d 347 (quoting *Roviaro v. United States*, 353 U.S. 53, 62, 1 L. Ed. 2d 639, 646, 77 S. Ct. 623 (1957)), *review denied*, 119 Wn.2d 1022 (1992). As such,

> [o]ne of the purposes of the in camera hearing is to ascertain whether the informant has testimonial knowledge that would be useful to the defendant at trial or in preparation. Where the informant is a significant participant in the transaction, disclosure may be required. *Roviaro*. On the other hand, if he does not possess such information, the balancing process does not require disclosure.

*Stansbury*, at 605; *see also State v. Wolken*, 103 Wn.2d 823, 829, 700 P.2d 319 (1985). After conducting such a balancing, the trial court is required to disclose the informant's identity only if it is relevant and helpful to the defense or essential to a fair determination of the charge. *State v. Thetford*, 109 Wn.2d 392, 396, 745 P.2d 496 (1987).

Here, the sealed record reveals both the true identity of the informant and a thorough investigation by the trial court in an in camera hearing. *See Wolken*, at 829. The informant confirmed conversations with Officer Kelly about Cormier's activities, professed no personal knowledge of Cormier's activities, denied knowledge of any information useful to the defense, and feared death might ensue if identity was disclosed.

Our review of the in camera hearing indicates the informant did not possess any information that was relevant to Kennedy or Gookin's guilt or innocence. Rather, the informant merely alerted the police to the possibility of criminal

---

[3]"Disclosure of an informant's identity shall not be required where the informant's identity is a prosecution secret and a failure to disclose will not infringe upon the constitutional rights of the defendant."

activity which was corroborated by further investigation. Disclosure of the informer's identity could not have been useful to the defense. *See State v. Sanchez*, 60 Wn. App. 687, 806 P.2d 782 (1991). Thus, the trial court did not err in refusing to disclose the informant's identity.

Affirmed.

SEINFELD, A.C.J., concurs.

ALEXANDER, C.J. (dissenting) — I respectfully dissent from the majority opinion. I do so because I believe that the magistrate abused his discretion in issuing the search warrant. While I am not unmindful of the axiom that we must accord great deference to the magistrate's determination of probable cause, it is readily apparent to me that there was an insufficient showing made to the magistrate that criminal activity was probably taking place within the cottage at the Alderbrook Inn.

The defendants are correct when they argue that the facts presented to the magistrate, while perhaps suspicious, are almost entirely innocuous, and consistent with legal activity. The information provided to the magistrate that likely caused the most suspicion was that a "chemical odor" emanated from the cottage and the bedding taken from it. Significantly, though, the magistrate was not told what this odor resembled or what odor is generally associated with "trafficking in controlled substances". Without some factual information to tie the chemical odor to the allegedly illicit activity, the provision of that information to the magistrate did nothing to support the issuance of the warrant. Although the odor was later described at the suppression hearing as the odor of "ether", that fact was not made known to the magistrate. Even if it had been, it is of little value because again, there is no suggestion that the odor of ether is associated with the manufacture of controlled substances. Much the same can be said about the information that the occupants of the cottage were "stoned",

because there is nothing to tie the observed condition to activities going on within the cottage.

In short, the information turned up by the independent investigation did not, by itself, furnish probable cause for the issuance of the warrant. Neither did it corroborate the tip of the informant to the extent that the *Aguilar-Spinelli* test can be said to have been satisfied. Consequently, the magistrate abused his discretion in issuing the warrant. Therefore, I would reverse.

Review denied at 123 Wn.2d 1031 (1994).